## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DISTRICT

| | | |
|---|---|---|
| **GINO ADAMSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-902-AMM** |
| | ) | |
| **THE CITY OF BIRMINGHAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case comes before the court on a motion for summary judgment filed by Defendant the City of Birmingham ("the City"). Doc. 25. For the reasons explained below, the motion is **GRANTED**.

## I.      BACKGROUND

Facts set forth in the parties' statement of undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party. Doc. 12 at 19. These are the undisputed material facts, taken as true, and construed in the light most favorable to Plaintiff Gino Adamson:

Mr. Adamson is an Army veteran. Doc. 24-1 at 22–23. On April 13, 2009, Mr. Adamson began working as a police officer for the City. *Id.* at 24–25. In early 2020, Mr. Adamson was assigned as a patrol officer to the West Precinct. *Id.* at 25.

"In the winter of 2020, the Secretary of Health and Human Services . . . determined that the threat posed by the novel SARS-CoV-2 virus constituted a public health emergency." *Health Freedom Def. Fund v. President of U.S.*, 71 F.4th 888, 890 (11th Cir. 2023). By March of 2020, "then-President Trump declared that the global outbreak constituted a national emergency." *Id*. "Over the course of the next three years, spanning two presidential administrations, public servants scrambled to take actions they believed would combat the spread of the disease and safeguard the well-being of Americans." *Id*. Mr. Adamson's claims arise from a requirement to wear face coverings during this time.

On April 24, 2020, Mr. Adamson was on duty at the University of Alabama at Birmingham ("UAB") Hospital. Doc. 24-1 at 27. He "was approached by UAB staff," and UAB staff "request[ed] that [Mr. Adamson] put a face mask on." *Id*. Mr. Adamson told UAB staff that he "couldn't wear a face mask because [the mask] impeded [his] breathing, made [him] feel anxious, [and] made [him] feel like [he] was suffocating." *Id*.

After Mr. Adamson "realized [his refusal] might be an issue," he notified his direct supervisor, Sergeant McCord. *Id*. Sergeant McCord sent another officer to relieve Mr. Adamson from his position at UAB Hospital. *Id*. "While waiting for that person to come up to UAB to relieve [Mr. Adamson], Sergeant Osborne approached [Mr. Adamson] and instructed [Mr. Adamson] that if [he] didn't put a face mask on,

[Mr. Adamson] would be taken out of service." *Id*. Mr. Adamson informed Sergeant Osborne that he could not wear a face mask. *Id*. at 27–28.

Sergeant Osborne "took [Mr. Adamson] out of service and sent [him] to Internal Affairs." *Id*. at 28. Mr. Adamson left UAB Hospital and provided Internal Affairs with his taped statement. *Id*. at 28–29. After he provided his statement, Mr. Adamson "was immediately put back into service." *Id*. at 28. Mr. Adamson did not receive "a letter of counseling, reprimand, suspension, termination, [or] demotion" because of the UAB incident. *Id*. at 31.

On May 1, 2020, the City issued its Face Covering Protocol ("the Protocol") for City employees. *Id*. at 255–56. The Protocol stated that "[e]ffective May 1, 2020, the City of Birmingham will expect that if employees are unable to maintain six (6) feet of social distancing while working, or engaging with the public, that they wear a face covering." *Id*. at 255. It listed the following as "[a]cceptable, reusable face covering options": "Bandana, scarf"; "Neck gaiter (also known as a tube scarf) or homemade face covering; "Tightly woven fabric, such as cotton T-shirts or types of towels." *Id*. The Protocol did not mention face shields. *See id*.

At the same time, "a City-wide ordinance went into effect requiring face masks for all individuals in public places." Doc. 26 at 3; *see also* Doc. 24-3 at 43. After the public ordinance expired, the City "continue[d] [to] enforc[e] the requirement for facial covering past the public ordinance." Doc. 24-2 at 96.

3

Mr. Adamson's supervisors, including Lieutenant Colston, requested that Mr. Adamson wear a mask. Doc. 24-1 at 31. When Mr. Adamson said he "wasn't able to wear a mask," Lieutenant Colston "took [him] out of service, told [him] to go home or go to the doctor to get a doctor's note." *Id*. at 32. Lieutenant Colston also "made comments since [Mr. Adamson] was a man that [he] probably [didn't] have a good relationship with [his] primary doctor," and gave him the information of her doctor. *Id*.

On May 4, 2020, Mr. Adamson saw Dr. Zachary Boylan. *Id*. at 186. Dr. Boylan's letter dated May 4, 2020, states:

> Mr. Adamson is a patient under my care. He reports that he has recently been required to wear a face mask at all times at his job as a police officer. He reports that wearing a mask induces a feeling of suffocation and anxiety that distracts him and potentially puts him at risk of harm given the nature of his work. Given this I recommended that he not wear a mask continuously, but to take general precautions in regards to hygiene and safety.

*Id*. at 187. It was not until September of 2020 that Mr. Adamson was diagnosed with post-traumatic stress disorder ("PTSD"). *Id*. at 34. Mr. Adamson provided his chain of command a copy of Dr. Boylan's letter. *Id*. at 37–38.

From around May 4, 2020, Mr. Adamson was "sent home for nearly the whole month of May, burning [his] own time." *Id*. at 30. On May 8, 2020, Veronica Merritt, the Chief Compliance Officer for the Human Resources Department, stated in an email:

4

Since [Mr.] Adamson is seeking an exception to required PPE, the determination should be made through the ADA accommodation process. The department should consider whether there is a position that he can be placed in temporarily, that does not require a mask, while his application is being reviewed. If there is not a position that allows this, he would need to be off work, using his accrued time, while the application is under review and we'll make every effort to review it quickly.

Doc. 24-2 at 97.

During this period, Mr. Adamson "was forced to use a hundred and twenty hours of [his] personal time," from which "[f]ifty hours" were credited back to him. Doc. 24-1 at 42. Ms. Merritt's email dated June 1, 2020, states: "We can reimburse Officer Adamson for the hours he used from May 10–20. We can't reimburse for the time that he refused the face shield as an alternative pending his application." Doc. 24-2 at 104. Mr. Adamson disputes the City's assertion that he initially refused to wear a face shield. *See* Doc. 26 at 4; Doc. 29 at 2; Doc. 24-1 at 41 (Mr. Adamson testifying that "[a]t no point was [he] given an opportunity to wear a face shield in patrol").

On May 22, 2020, Dr. Boylan and Mr. Adamson completed the City's "ADA Reasonable Accommodation Request" paperwork. Doc. 24-1 at 188–97. When asked whether Mr. Adamson had "a disability that substantially limits a major life activity," Dr. Boylan stated: "Yes. The patient experiences anxiety when asked to wear a mask while working." *Id*. at 188. Similarly, when asked to "indicate [his]

disability and how it limits a major life function(s) that relate[s] to [his] job," Mr.

Adamson stated: "The mask that I am asked to wear causes anxiety." *Id*. at 191.

When prompted to suggest an accommodation for Mr. Adamson, Dr. Boylan

stated:

> The simple answer would be to allow him to work without a mask,
> however, in this unprecedented time, this may be difficult to do. Other
> accommodations may be trying different protective equipment such as
> a face shield as it may be less restrictive on his breathing and might
> exacerbate his anxiety less. Other options may include moving him to
> a "desk job" where he would be allowed to work without a mask.

*Id*. at 188. When asked to describe the accommodations that he was requesting, Mr.

Adamson stated: "I am asking to not be forced into wearing a mask and to return to

my job. Possibly to wear a face shield." *Id*. at 191. The City received Mr. Adamson's

paperwork on May 27, 2020. Doc. 24-2 at 102.

Around June 3, 2020, Mr. Adamson "got a call from Captain Theophilus

Smith" informing him that he "would be reassigned to the jail and that [Mr. Adamson

would] be allowed to wear . . . a face shield at the jail." Doc. 24-1 at 41. The City

did not give Mr. Adamson "an opportunity to wear a face shield in patrol." *Id*. Patrick

Bailey and Anthony Wheeler, two "other white police officers that were assigned to

the West Precinct and reported to [Lieutenant] Colston," were not reassigned to the

jail. *Id*. at 54–55.

Patrick Smith, the Chief of Police, stated in an email dated May 27, 2020:

"While we do not find it wise to have Gino Adamson in a patrol precinct wearing a

plastic shield only, as he responds to calls for service and entering various homes[,] [w]e may be able to assign him to the jail, where he is able to wear the face shield without radio call response." Doc. 24-2 at 96. Chief Smith also stated in an email dated June 30, 2020: "The shield alone doesn't provide sufficient protection needed in a patrol environment going from location to location. Thus, increasing the risk of Covid exposure into the patrol force, by responding to various calls." *Id*. at 99.

At the jail, Mr. Adamson was "permitted to wear a face shield instead of a face mask or other face covering." Doc. 24-1 at 46. His duties there included "checking individuals that were brought into the jail by performing pat downs and searching their property," "taking mug shots and getting fingerprints for inmates," "do[ing] periodic checks in the cell blocks where the inmates were housed," and "meet[ing] [a] person in the jail lobby and . . . bring[ing] them inside the jail." Doc. 29-3 at 2. Whereas other "police officers that were assigned to the jail . . . were able to transport prisoners to . . . doctor's visits or . . . to the county or different places," Mr. Adamson "was not allowed to leave the building in any capacity." Doc. 24-1 at 44. Brian Sheets, another white police officer who was assigned to the jail at the same time as Mr. Adamson, was "free to come and go" from the building as he needed. *Id*. at 55.

Once reassigned to the jail, Mr. Adamson did not have "[t]he ability to interact with citizens" and was unable to "see and help people throughout the city" by

responding to calls. *Id*. at 121. His interactions were limited to "individuals that were brought into the jail" and "inmates." Doc. 29-3 at 2. There were "physical altercations with inmates" at times. *Id*.

Mr. Adamson's reassignment to the jail did not entail a change in his job class or a reduction in pay. Doc. 24-1 at 45. There were other police officers who were assigned to the jail. *Id*. at 143. Mr. Adamson regarded the reassignment as a "punishment or retaliation." *Id*. at 59. Mr. Adamson provides in this case two affidavits of fellow City police officers who testified that "[i]t is widely known . . . that reassignment from patrol to the Birmingham City Jail is regarded by police officers as a highly unfavorable reassignment." Doc. 29-1 at 2; Doc. 29-2 at 2.

Mr. Adamson testified that he does not recall "hear[ing] any sort of race-based statements from other city employees," or "hear[ing] any racial slurs," and did not "see any display of racially offensive symbols." *Id*. at 53. But with the "vast majority of [his] supervisors" being Black, Mr. Adamson felt "singled out" as a white police officer. *Id*. at 52. As reasons for why he felt he was treated differently, Mr. Adamson testified that it was because he was "reassigned to the jail in the first place . . . [a]nd then told that [he] couldn't leave the jail in any capacity." *Id*. at 52–53. Mr. Adamson was also the only officer who had Monday and Tuesday off days, instead of Friday and Saturday off days or Sunday and Monday off days. *Id*. at 45. Mr. Adamson testified that he "was given Monday, Tuesday off days with the understanding that's

because in patrol, I had a Monday, Tuesday, Wednesday off day so they wanted it to be similar to what I had in patrol." *Id.*

On September 16, 2020, Mr. Adamson filed a charge of discrimination with the EEOC, alleging that the City discriminated and retaliated against him based on his race and disability. Doc. 1-1 at 2.

On February 4, 2021, Mr. Adamson was served a Notice of Determination Hearing. Doc. 24-1 at 265. Mr. Adamson was "notified that possible personnel action [was] contemplated against [him]." *Id.* The Notice alleged that "on April 24, 2020, while on-duty, Officer Gino Adamson disobeyed a direct order from Sergeant Joshua Osborne when he refused to put on a protective mask." *Id.* at 266. The Notice informed Mr. Adamson that his determination hearing was scheduled to take place on February 10, 2021, and that "[a]t that time [he] will have the opportunity to respond to the above statement orally or in writing or both if you so desire." *Id.* at 265. The Notice cautioned that "[t]he personnel action could be to discipline and may result in suspension, demotion or dismissal." *Id.*

When Mr. Adamson appeared for the determination hearing, he was informed that his hearing would have to be rescheduled. *Id.* at 131. The hearing never took place. *Id.* at 30 (Mr. Adamson testifying that he "got the letter of determination hearing, but we never had that hearing").

On April 30, 2021, the City revised the Face Covering Protocol. *Id*. at 257. The revised Protocol stated that "face shields are acceptable only when used in conjunction with a cloth or disposable face mask," and that "[e]mployees may not wear a face shield alone, unless a medical exemption has been approved by Human Resources based on sufficient medical documentation." *Id*.

The EEOC issued its notice of right to sue on May 3, 2021, Doc. 1-2, and Mr. Adamson filed this action on July 1, 2021. Doc. 1. Mr. Adamson retired from employment in August 2021, because of his "PTSD-related conditions." Doc. 24-1 at 26 (Mr. Adamson testifying that he retired for a "medical reason").

Mr. Adamson's complaint asserts four claims: (1) employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq*. ("the ADA") (Count I); (2) retaliation in violation of the ADA (Count II); (3) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") (Count III); and (4) retaliation in violation of Title VII (Count IV).[1] Doc. 1. The City filed the pending motion for summary judgment. Docs. 25, 26. Mr. Adamson timely responded. Doc. 29. The City did not file a reply.

---

[1] In its motion for summary judgment, the City asserts that although "[h]ostile work environment is mentioned in the text of paragraphs 41 and 56" of the complaint, Mr. Adamson "did not name a hostile work environment claim in the Counts of his Complaint." Doc. 26 at 28. The City argues "[Mr. Adamson] has not brought a hostile work environment claim and should be barred from bringing one at this late stage." *Id*. Mr. Adamson does not respond to this argument. It is under the heading of "Disputed Facts" only that Mr. Adamson asserts that he "testified that 'being assigned to the jail and then being treated differently than everybody else there' created a hostile work environment." Doc. 29 at 5. Mr. Adamson makes no other reference to a hostile work environment

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up).

In deciding a motion for summary judgment, the court "must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). "Nonetheless, unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Id*. (cleaned up). "Further, a mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Gogel v. Kia Motors Mfg. of Ga., Inc.,* 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (cleaned up). "Summary judgment must be granted if the nonmoving party has 'failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.'" *Rink v. Cheminova,*

---

in his response. "To prevail on a particular theory of liability, a party must present that argument to the district court." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011). "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

*Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III.    ANALYSIS

### A. Mr. Adamson's ADA Discrimination Claim (Count I)

"To establish a *prima facie* case of discrimination under the ADA, [Mr. Adamson] must show that he (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of his disability." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) (cleaned up). The parties do not dispute that Mr. Adamson was disabled and qualified under the ADA, at least as of May 2020, when Mr. Adamson submitted his request for accommodations. *See* Doc. 26 at 10; Doc. 29 at 9. Accordingly, the court focuses its analysis on whether the City discriminated against Mr. Adamson because of his disability.

"[T]he ADA prohibits a broad variety of adverse employment actions, whenever those actions are taken for a prohibited reason." *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1447 (11th Cir. 1998) (cleaned up). Under the ADA, "no covered employer may use the disability of an otherwise qualified person as an excuse for discrimination in hiring, promotion, discharge, compensation, training, or other terms, conditions, and privileges of employment." *Id.* (cleaned up); *see also* 42 U.S.C. § 12112(a).

12

An employer discriminates on the basis of a disability "when the employer fails to provide reasonable accommodations for the disability—unless doing so would impose undue hardship on the employer." *Beasley*, 69 F.4th at 754 (cleaned up). "[A]n employer is not required to accommodate an employee in *any* manner that the employee desires—or even provide that employee's preferred accommodation." *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020). A reasonable accommodation can include, among other things, job restructuring, modified work schedules, or reassignment. *See*, *e.g.*, *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).

"[T]here are two distinct categories of disability discrimination claims under the ADA—failure to accommodate and disparate treatment . . . ." *L.E. by and Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302 (11th Cir. 2022). For a failure-to-accommodate claim, there is no "additional burden" for the plaintiff to prove that disabled employees are treated differently from non-disabled employees. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007). Nor does the employer have a "subsequent burden[]" to show a "legitimate non-discriminatory reason[]," which the plaintiff must establish as "pretextual." *Id.* (cleaned up).

Mr. Adamson argues that he has established a *prima facie* case of discrimination under the ADA because "the [City] failed to grant [him] a reasonable

accommodation and instead reassigned [him] to jail constituting an adverse employment action." Doc. 29 at 14. Implicit in this argument is an assumption that the reassignment was not a reasonable accommodation.

Mr. Adamson stated in his ADA Reasonable Accommodation Request form that he wished to "not be forced to wear a mask," but "possibly to wear a face shield." Doc. 24-1 at 191. Dr. Boylan suggested that the City could accommodate this request by "trying different protective equipment such as a face shield" or "moving [Mr. Adamson] to a 'desk job' where he would be allowed to work without a mask." *Id*. at 188. The City adopted both suggestions from Dr. Boylan and reassigned Mr. Adamson to the jail, where he did not have to wear a face mask and could wear a face shield instead. *See id*. at 41, 46. Although Mr. Adamson asserts that "his ADA Request for Reasonable Accommodation was intended to be a request that [he] wear a face shield (instead of a mask) and that [he] remain in his role as a patrol officer," Doc. 29 at 11–12, the City was not required to provide his "preferred accommodation." *D'Onofrio*, 964 F.3d at 1022. Because it is undisputed that Mr. Adamson was permitted to not wear a face mask at the jail, no reasonable jury could find that when the City reassigned Mr. Adamson to the jail, the City failed to reasonably accommodate Mr. Adamson for his disability.

Mr. Adamson's ADA discrimination claim cannot survive summary judgment even if it is read to allege disparate treatment rather than a failure to accommodate.

To establish disparate treatment, Mr. Adamson must "establish causation—*i.e.*, that the [employer] took the alleged employment actions against [him] because of his disability." *Sugg v. City of Sunrise*, No. 20-13884, 2022 WL 4296992, at \*11 (11th Cir. Sept. 19, 2022).

Based on the record in this case, the only avenue for Mr. Adamson to establish disparate treatment is with circumstantial evidence. The burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies when a plaintiff seeks to prove disability discrimination through circumstantial evidence. *Sugg*, 2022 WL 4296992, at \*11. "To satisfy the causation element of a prima facie discrimination case [under the ADA], a plaintiff must present enough circumstantial evidence to allow a jury to infer intentional discrimination by the decisionmaker." *Id*. "Establishing a prima facie case creates a presumption of discrimination, and the burden then shifts to the [employer] to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]." *Id*. "If the [employer] meets this burden, the burden shifts back to [the plaintiff] to raise a reasonable inference that the [employer's] reason is pretextual." *Id*.

Under the *McDonnell Douglas* framework, the defendant's "burden is one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143 (cleaned up).

"To avoid summary judgment the plaintiff must introduce significantly probative evidence showing that the [employer's] asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up). "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

"To show pretext, [the plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (cleaned up).

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [his] business judgment for that of the employer." *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1265–66 (quoting *Chapman*, 229 F.3d at 1030).

Mr. Adamson asserts that he suffered adverse employment actions when he was: (1) reassigned to the jail; (2) not allowed to leave the jail while on duty at the jail; (3) not given the same off-days as other police officers assigned to the jail; and (4) not returned all the hours of personal leave he took in May 2020. Doc. 29 at 12–14. But Mr. Adamson cites no evidence that would allow a reasonable jury to find that the City took those allegedly adverse actions because of his disability.

The City asserts that it reassigned Mr. Adamson to the jail because he "requested an accommodation to not wear a face mask at the height of the COVID-19 pandemic" and the jail was a "more controlled environment that would allow for the use of a facial shield." Doc. 26 at 14. Specifically, the City "determined that wearing a facial shield on patrol, where officers are required to respond to calls for service which involves entering homes, businesses, hospitals, etc., posed additional risk to the officer and to the police." *Id*. at 4; *see also* Doc. 24-2 at 99 (Chief Smith's email stating concerns about Mr. Adamson "going from location to location" and "increasing the risk of Covid exposure into the patrol force"); *id*. at 17 (Ms. Merritt testifying about Chief Smith's communication that "a face shield would not provide complete coverage or safety to the public or to officers" while on patrol duty). According to the City, "the jail assignment was an assignment that was considered to be a controlled environment where an officer wearing only a face shield would not be going in various homes." Doc. 26 at 4.

Mr. Adamson has developed no evidence that the City's reason was pretextual. Although Mr. Adamson asserts that "[t]here is conflicting testimony by Veronica Merritt and Chief Patrick Smith regarding who actually made the decision to transfer [him] to the jail," Doc. 29 at 2, he does not explain why this dispute is material. There is no evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1265 (cleaned up).

Although Mr. Adamson asserts that his "reassignment to the jail had [him] doing the exact thing the City allegedly was trying to prevent, e.g., interacting directly with the public, being surrounded by coworkers in enclosed spaces, and engaging in physical altercations with inmates," Doc. 29 at 13, the evidence is consistent with the City's efforts to limit the extent of Mr. Adamson's physical contact with the public. Mr. Adamson testified that he did not have the "ability to interact with citizens" at the jail, Doc. 24-1 at 121, and that he could not transport inmates to doctor's visits or any other place outside the jail. *Id*. at 44. And Mr. Adamson's affidavit about his duties at the jail describes interactions only with "individuals that were brought into the jail" and "inmates." Doc. 29-3 at 2.

Mr. Adamson asserts that he could have been "separated from the general public by a partition" while "working a desk job at the precinct," but that does not

make the City's proffered reason inconsistent or incoherent. Doc. 29 at 14. It "simply quarrel[s] with the wisdom of that reason," which is insufficient to survive summary judgment. *Alvarez*, 610 F.3d at 1266 (cleaned up).

Moreover, Mr. Adamson has not developed evidence that the real reason for his transfer to the jail was discriminatory. He does not assert that he heard derogatory remarks about his disability during his employment with the City. *See* Doc. 29 at 7–14. He testified that his supervisors instructed him to wear a face mask and that Lieutenant Colston "made comments [that] since [Mr. Adamson] was a man [he] probably didn't have a good relationship with [his] primary doctor." Doc. 24-1 at 32. The City's concern about the adequacy of face shields as protection against COVID-19 is consistently demonstrated in its revised Protocol. *See id*. at 257. Mr. Adamson thus fails to establish pretext regarding his reassignment to the jail.

Mr. Adamson likewise fails to establish pretext regarding the other allegedly adverse actions by the City. Mr. Adamson testified that the City "never really gave [him] a reason as to why" he could not leave the jail, *id*. at 58, but the City's decision to limit Mr. Adamson's movements to the jail is consistent with its proffered reason for reassigning him to the jail in the first place: "the jail assignment was an assignment that was considered to be a controlled environment where an officer wearing only a face shield would not be going in various homes." Doc. 26 at 4. And even assuming *arguendo* that different off-days could constitute an adverse

19

employment action under the ADA, Mr. Adamson testified that the City wanted his off days to be "similar to what [he] had in patrol." Doc. 24-1 at 45. Mr. Adamson cites no evidence that this proffered reason was false, nor that the real reason was discriminatory.

As for not returning all the hours of personal leave that Mr. Adamson took, Ms. Merritt informed Mr. Adamson's attorney that the City "can't reimburse for the time that [Mr. Adamson] refused the face shield as an alternative pending his application." Doc. 24-2 at 104. Mr. Adamson concedes that the City returned fifty hours, Doc. 24-1 at 42, and disputes the City's assertion that he initially refused to wear a face shield. *See* Doc. 26 at 4; Doc. 29 at 2. When the court credits (as it must) Mr. Adamson's testimony that "[a]t no point was [he] given an opportunity to wear a face shield in patrol," Doc. 24-1 at 41, that establishes only that the City's proffered reason for not returning all of his hours was mistaken or false. Mr. Adamson cites no evidence that would allow a reasonable jury to find that the City returned some, but not all, of his hours of personal leave for a discriminatory reason.

Accordingly, summary judgment is **GRANTED** in favor of the City on Mr. Adamson's ADA discrimination claim.

### B. Mr. Adamson's Title VII Discrimination (Count III)

"In order to survive summary judgment, a plaintiff alleging intentional discrimination [under Title VII] must present sufficient facts to permit a jury to rule

in [his] favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that []he can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*." *Id*. "A plaintiff can also . . . demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination . . . ." *Id*. n.6. The court addresses each framework in turn.

### 1. *McDonnell Douglas*

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must establish "a *prima facie* case of discrimination by showing (1) that []he belongs to a protected class, (2) that []he was subjected to an adverse employment action, (3) that []he was qualified to perform the job . . . and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Id*. at 1220–21. The proffered "comparator" must be "similarly situated in all material respects." *Id*. at 1226. Because "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects,'" summary judgment is appropriate "where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." *Id*. at 1228–29.

Although similarity "in all material respects" has to be evaluated on a "case-by-case basis, in the context of individual circumstances," the Eleventh Circuit has provided guideposts for what the standard ordinarily requires. *Id*. at 1227. First, the comparator "will have engaged in the same basic conduct (or misconduct) as the

plaintiff." *Id*. Second, the comparator "will have been subject to the same employment policy, guideline, or rule as the plaintiff." *Id*. Third, the comparator "will ordinarily . . . have been under the jurisdiction of the same supervisor as the plaintiff." *Id*. at 1227–28. Fourth, the comparator "will share the plaintiff's employment or disciplinary history." *Id*. at 1228. In the light of these guideposts, "employees who are differently situated in material respects" include those "who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id*. (cleaned up).

"If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id*. at 1221. "[S]hould the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination." *Id*. (cleaned up).

Mr. Adamson asserts that he "has established a prima facie case of race discrimination pursuant to Title VII." Doc. 29 at 17. Mr. Adamson argues that he has done so under the *McDonnell Douglas* framework, including the requirement of showing that "the City treated employees outside of his class more favorably." *Id*. at 19. Specifically, Mr. Adamson, who is white, asserts that he "testified about the

numerous other black patrol officers who were not disciplined or reassigned for failing to wear a mask." *Id*.

At his deposition, Mr. Adamson testified that he had "several pictures of officers" who were Black and "not disciplined or reassigned for failing to wear a mask." Doc. 24-1 at 70. In those photographs, both Black and white officers who are outdoors are seen without face masks. *See id*. at 251–54. Such evidence is insufficient to establish a valid comparator.

The photographs do not show that those Black officers engaged in the same conduct as Mr. Adamson by first, failing to wear a face mask indoors, including at a hospital, and second, requesting accommodations not to wear a face mask. Mr. Adamson testified that he did not know whether "the black officers that weren't disciplined or reassigned for failing to wear face masks . . . submit[ted] accommodation requests related to the face mask," Doc. 24-1 at 71, and he does not cite to evidence that they did. *See* Doc. 29 at 19. That includes Officer Reese and Office Hunt, whom Mr. Adamson named at his deposition as "black male" officers who were "not written up" for failing to wear a mask. Doc. 24-1 at 75 (Mr. Adamson testifying that he did not know if Officer Reese and Officer Hunt "submitted any sort of accommodation related to the face mask").

Because Mr. Adamson fails to identify a valid comparator, he cannot establish a *prima facie* case of discrimination under *McDonnell Douglas*.

2.  Convincing Mosaic

"[A]n employee can . . . survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (cleaned up). Although a convincing mosaic standard "offers an alternative to plaintiffs unable to succeed through the *McDonnell Douglas* framework . . . the convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough evidence for a reasonable jury to infer intentional discrimination." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250 (cleaned up).

As discussed above, Mr. Adamson cannot establish that the City's proffered reasons for reassigning him to the jail, limiting his movements to the jail, giving him different off-days, and not returning all his hours of personal leave were pretextual. *See supra* Section III.A. That "each of [Mr. Adamson's] supervisors (with one exception) who were subjecting [him] to these adverse employment actions were all black" is not sufficient circumstantial evidence of discriminatory intent, particularly

24

when other white police officers were not subject to the alleged adverse employment actions. Doc. 29 at 19. For example, Mr. Adamson testified that two other white officers who also reported to Lieutenant Colston were not reassigned to the jail. Doc. 24-1 at 54–55. Mr. Adamson also testified that another white officer who was assigned to the jail at the same time as him was "free to come and go" from the building as he needed. *Id*. at 55.

Because Mr. Adamson also fails to establish discriminatory intent under the convincing mosaic standard, summary judgment is **GRANTED** in favor of the City on Mr. Adamson's Title VII discrimination claim.

### C. Retaliation Claims under the ADA and Title VII (Counts II and IV)

Retaliation claims under the ADA and Title VII are analyzed under the same burden-shifting framework. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021). Accordingly, the court addresses Mr. Adamson's retaliation claims together.

"To establish a prima facie case of retaliation, [the plaintiff] must show (1) []he participated in conduct that the statute protects; (2) []he suffered an adverse employment action; and (3) the protected conduct and the adverse employment action are causally related." *Id*. "[T]he employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

25

53, 57 (2006). Further, the plaintiff "must show that [his] protected activity was a but-for cause of the alleged adverse action." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023) (cleaned up). "The but-for standard asks whether a particular outcome would not have happened 'but for' the purported cause." *Id*. (cleaned up).

Evidence of temporal proximity between the protected activity and the adverse employment action can establish causation. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010). But "mere temporal proximity, without more, must be very close to suggest causation." *Jefferson v. Sewon Am.*, *Inc.*, 891 F.3d 911, 926 (11th Cir. 2018) (cleaned up). "Even a three-month interval between the protected expression and the employment action . . . is too long." *Brown*, 597 F.3d at 1182. "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id*.

"If the plaintiff makes out a prima facie case, the employer must then articulate a legitimate, non-discriminatory reason or reasons for its actions." *Yelling*, 82 F.4th at 1337 (cleaned up). "If the employer does, the plaintiff must show that the proffered reasons were pretext and that the employer's real reason was retaliation." *Id*. "[T]emporal proximity by itself generally cannot prove that an employer's proffered reasons are pretextual." *Todd*, 998 F.3d at 1219; *Johnson v. Miami-Dade*

26

*Cnty.*, 948 F.3d 1318, 1328 (11th Cir. 2020) (holding that "much shorter disparities [than two months] are insufficient, standing alone, to establish pretext").

"An employee participates in a protected activity when he makes a request for a reasonable accommodation." *Belgrave v. Publix Super Market, Inc.*, No. 22-13021, 2023 WL 3477790, at \*4 (11th Cir. May 16, 2023) (cleaned up); *see also Frazier-White*, 818 F.3d at 1258 (assuming that the plaintiff's requests for an accommodation "constitute[d] protected expression"). Filing an EEOC Charge of discrimination is also a protected activity. *See Furcron*, 843 F.3d at 1311. The parties do not dispute that Mr. Adamson participated in protected conduct by requesting reasonable accommodations and by filing his EEOC charge. Doc. 26 at 23; Doc. 29 at 16–17.

According to Mr. Adamson, he has established a *prima facie* case of retaliation for his request of reasonable accommodations, because he "immediately" suffered allegedly adverse employment actions after making the request. Doc. 29 at 16. But even if Mr. Adamson could establish causation based on the week or so that passed between the submission of his ADA accommodation request paperwork and the reassignment to the jail, temporal proximity by itself is insufficient to establish that the City's proffered reasons are pretextual. *See supra* Section III.A; *Todd*, 998 F.3d at 1219. Temporal proximity particularly lacks probative value of pretext in this case because the City's proffered reason for the reassignment was to grant, not

deny, reasonable accommodation. Accordingly, Mr. Adamson fails to establish retaliation for requesting reasonable accommodations.

The only allegedly adverse employment outcome that Mr. Adamson suffered after filing his EEOC charge is receiving the Notice of Determination Hearing regarding the incident at UAB on April 20, 2020. Doc. 29 at 17. But the determination hearing never took place, and Mr. Adamson did not receive "a letter of counseling, reprimand, suspension, termination, [or] demotion" because of the UAB incident. Doc. 24-1 at 31.

Assuming without deciding that a reasonable jury could find that a mere notice of determination hearing could "well dissuade a reasonable worker" from filing an EEOC charge, *Burlington*, 548 U.S. at 57, Mr. Adamson nonetheless fails to establish but-for causation. Mr. Adamson makes no argument regarding but-for causation, apart from asserting that "it is highly unusual for an investigation into such a charge to take such an extended period of time." Doc. 29 at 17. To the extent that Mr. Adamson insinuates that a determination hearing was belatedly scheduled because of his EEOC charge, he was served his Notice of Determination Hearing on February 4, 2021, when he filed his EEOC charge on September 16, 2020. *See* Doc. 24-1 at 265; Doc. 1-1 at 2. The lapse of nearly five months cannot establish temporal proximity. *See Brown*, 597 F.3d at 1182. Mr. Adamson thus fails to establish retaliation for filing an EEOC charge.

Accordingly, summary judgment is **GRANTED** in favor of the City on both of Mr. Adamson's retaliation claims.

## IV.    CONCLUSION

For the foregoing reasons, the City's motion for summary judgment is **GRANTED** in favor of the City on all Mr. Adamson's claims.

**DONE** and **ORDERED** this 18th day of March, 2024.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE